## STATE v. RICHARD C. BAKER.

(Filed 19 May, 1948.)

**1. Physicians and Surgeons § 1—**

The statutes recognize the distinction between the practice of osteopathy and the practice of medicine and surgery. G. S., 90, art. 1; G. S., 90, art. 7.

**2. Statutes § 5—**

In construing a statute it will be assumed that the Legislature comprehended the import of the words employed by it to express its intent.

**3. Physicians and Surgeons § 1—**

Osteopathy is a system of healing without the use of medicine, drugs or surgery. G. S., 90-129.

**4. Same: Physicians and Surgeons § 8—**

In a prosecution of an osteopath for practicing medicine without a license, the State does not have the burden of showing that the administration or prescription of medicines with which defendant is charged was not taught in the recognized colleges of osteopathy. The statutory definition of osteopathy as "the science of healing without the use of drugs" is not enlarged by the words, "as taught by the various colleges of osteopathy," since the limitation perforce relates to the study of that particular system of healing and could not include any other system regardless of the curricula of such colleges. G. S., 90-129.

**5. Physicians and Surgeons § 8—**

A licensed osteopathic physician exceeds the limits of his certificate and is guilty of practicing medicine without being licensed and registered if he administers or prescribes drugs in treating the ailments of his patients. G. S., 90-18; G. S., 90-19.

**6. Physicians and Surgeons § 1—**

A "drug" within the meaning of the rule that an osteopath may not administer or prescribe drugs in treating his patients, is any substance used as a medicine or in the composition of medicines for internal or external use, irrespective of whether it contains poisonous ingredients or is purchasable without a physician's prescription, and the definition includes patent or proprietary remedies. The Narcotic Drug Act deals with a different subject and does not furnish the criterion for determining the meaning of "drugs" in relation to the practice of medicine without a license.

**7. Physicians and Surgeons §§ 1, 8—**

An osteopath does not practice medicine in advising a client to feed her baby a designated brand of canned milk, since milk is a food and not a drug.

**8. Same—**

Whether a vitamin preparation is a drug or a food depends upon whether or not it is administered or employed as a medicine, which is ordinarily a question of fact.

**9. Physicians and Surgeons § 8—**

    Laxatives and tonics are "drugs" within the meaning of the law prohibiting an osteopath from prescribing or administering drugs.

**10. Same—**

    An osteopath is not guilty of practicing medicine without a license in administering violet ray treatments to his patients suffering with skin diseases. G. S., 90-18 (13).

**11. Same—**

    The giving of a hypodermic injection is administering a drug.

**12. Same—**

    The giving of oral directions to the patient directly or indirectly by telephone directions to the druggist for the use or application by the patient of recommended remedies is prescribing drugs.

**13. Same—**

    A person who holds himself out as an expert in medical affairs and who prescribes drugs for his patients and charges fees for so doing practices medicine notwithstanding the drugs are patent or proprietary remedies purchasable without a prescription, and notwithstanding the fact that the recommendation of such remedies to acquaintances without the charge of a fee would not be unlawful.

**14. Criminal Law § 52b—**

    Where defendant introduces no evidence and intent is not an element of the offense, the court may charge upon the State's unambiguous and uncontradicted evidence of guilt that the jury should convict defendant if they find beyond a reasonable doubt that all the evidence in the case is true and that otherwise they should return a verdict of not guilty.

APPEAL by defendant, Richard C. Baker, from *Rousseau, J.,* and a jury, at the September Term, 1947, of RICHMOND.

The defendant was prosecuted upon an indictment charging that he practiced medicine in Richmond County between 7 April, 1944, and 7 April, 1946, by administering and prescribing drugs in treating the ailments of others without being licensed and registered so to do contrary to the provisions of G. S., 90-18, and G. S., 90-19. He entered a plea of not guilty.

It was judicially admitted by both the State and the accused on the trial in the court below that the defendant held a certificate from the North Carolina State Board of Osteopathic Examination and Registration entitling him to practice osteopathy at the times named in the indictment, but that he had never received a license to practice medicine and surgery from the North Carolina State Board of Medical Examiners and had never registered as a physician or surgeon with the Clerk of the Superior Court of Richmond County. The only testimony at the trial

was that of the State. This evidence tended to show that the matters set out below occurred in Richmond County during the period specified in the indictment.

The accused engaged in the practice of the healing art for compensation. By means of a printed professional card, he represented himself to be a "physician and surgeon." He examined his patients, diagnosed their ailments, and determined the remedies to be applied.

As a general rule, he confined his practice to treating the parts and tissues of the bodies of his patients by manipulations with his hands without the use of medicines. He administered violet ray treatments to those suffering with skin diseases, and relied upon hypodermic injections of alcohol and "liver extracts" for the alleviation of certain other ailments. Upon at least two occasions, he gave a patient afflicted with low blood pressure injections of a liquid which he represented to be a "heart stimulant." He advised one mother to put her nursing baby upon a brand of canned milk known as Carnation Milk.

On numerous occasions, the accused directed his patients to procure from druggists and to use either internally or externally in the treatment of their ailments various patent or proprietary preparations possessing or reputed to possess curative or remedial properties. He said that he "couldn't write prescriptions," and did not issue any written prescriptions covering any of these substances. But he gave oral orders therefor to the druggists, and the druggists delivered the preparations to his patients in bottles or other containers bearing statements of his directions with respect to their mode of administration. A few of these patent or proprietary remedies were laxatives or tonics.

The preparations were delivered to the defendant's patients in the identical form in which they had been received by the druggists from the manufacturers, contained no poisonous ingredients in harmful quantities, and could have been bought by any person without any order from a physician. Some of them could even have been obtained at ordinary grocery stores. The accused required some of his patients to buy and use certain patent or proprietary vitamin preparations.

The jury found the defendant guilty "in manner and form as charged in the bill of indictment," the court sentenced him to pay a fine of $100.00 and the costs, and he appealed to this Court, assigning many errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody, and Smith, Leach & Anderson for the State.*

*Jones & Jones, F. W. Bynum, and Ehringhaus & Ehringhaus for defendant, appellant.*

STATE *v.* BAKER.

ERVIN, J.   The accused insists at the outset that he was entitled to a judgment of nonsuit or to a directed acquittal pursuant to his requests for instruction in the court below upon the specific ground that his certificate as an osteopathic physician gave him a right to use drugs in the treatment of his patients similar to that enjoyed by licensed practitioners of medicine and surgery, and that by reason thereof the evidence of the State was legally insufficient to support his conviction, even if it be taken for granted that he had actually administered and prescribed drugs in the course of his practice.   Consequently, this appeal presents this fundamental question: Is an osteopathic physician duly licensed by the North Carolina State Board of Osteopathic Examination and Registration entitled under the law to administer or prescribe drugs in treating the ailments of his patients?

Licenses to practice medicine and surgery are granted by the State Board of Medical Examiners under article 1 of chapter 90 of the General Statutes, and certificates to practice osteopathy are issued by the State Board of Osteopathic Examination and Registration under article 7 of chapter 90 of the General Statutes.

An inspection of these statutes makes it evident that the Legislature regarded the practice of medicine and surgery as one thing, and the practice of osteopathy as another.   But it considered that both of these schools of healing had merit in that they were seeking the common objective of alleviating or curing the ills that afflict the flesh.   So it authorized the practice of both systems.   In so doing, however, it recognized that these schools of healing were founded upon radically different ideas, and it undertook to protect the public against incompetency at the hands of either group by insuring that the practitioners of each school should be qualified to pursue the particular system that they professed to practice.   With this object in view, the Legislature enacted statutes requiring applicants for licenses to practice medicine and surgery to attend medical schools, to take courses calculated to equip them to administer and prescribe drugs and use surgical instruments, and to undergo examination as to proficiency to practice medicine and surgery by a licensing board composed of regularly graduated physicians appointed by the North Carolina Medical Society.   G. S., c. 90, art. 1.   In like manner, the Legislature decreed that applicants for certificates to practice osteopathy should attend colleges of osteopathy, pursue studies designed to qualify them to treat diseases without the use of drugs, and to undergo examination as to competency to practice osteopathy by a licensing board composed of practitioners of osteopathy appointed by the Governor upon the recommendation of the North Carolina Osteopathic Society.   G. S., c. 90, art. 7. It is significant that the Legislature specifies that applicants for licenses to practice medicine and surgery shall study the subjects of materia

medica and therapeutics, but makes no such requirement with respect to applicants for certificates to practice osteopathy. G. S., 90-10; G. S., 90-131. It is also significant that a licensed osteopath is designated as an osteopathic physician by the Legislature. G. S., 90-134.

It is reasonable to assume that the Legislature comprehended the import of the words it employed to express its intent when it enacted the statutes relating to osteopathy. There is no lack of clarity in the meaning of "osteopathy" either in language or in law. It is the very antithesis of any science of medicine involving the use of drugs. *Georgia Ass'n of Osteopathic Physicians and Surgeons v. Allen,* 112 F. (2d), 52. Dictionaries and judicial decisions uniformly declare that osteopathy is a system of treating diseases of the human body without drugs or surgery. *S. v. McKnight,* 131 N. C., 717, 42 S. E., 580, 59 L. R. A., 187; *S. v. Siler,* 169 N. C., 314, 84 S. E., 1015; Funk & Wagnalls' New Standard Dictionary; 41 Am. Jur., Physicians and Surgeons, sec. 2; 46 C. J., 1142; 86 A. L. R., 626-630; *Burke v. State Osteopathic Ass'n,* 111 F. (2d), 250; *Waldo v. Poe,* 14 F. (2d), 749; *In re Rust,* 181 Cal., 73, 183 P., 548; *Mabry v. State Board of Examiners in Optometry,* 190 Ga., 751, 10 S. E. (2d), 740; *State v. Sawyer,* 36 Ida., 814, 214 P., 222; *State v. Stoddard,* 215 Iowa, 534, 245 N. W., 273, 86 A. L. R., 616; *State v. Moore,* 154 Kan., 193, 117 P. (2d), 598; *State v. Johnson,* 84 Kan., 411, 114 P., 390, 41 L. R. A. (N. S.), 539; *State v. Hopkins,* 54 Mont., 52, 166 P., 304, Ann. Cas. 1918D, 956; *State v. Wagner,* 139 Neb., 471, 297 N. W., 906; *State v. Chase,* 76 N. H., 553, 86 A., 144; *State v. Bonham,* 93 Wash., 489, 161 P., 377, L. R. A., 1917D, 996; *Arnold v. Schmidt,* 155 Wis., 55, 143 N. W., 1055. The osteopath "heals by means of a system of rubbing and kneading the body, applying hot or cold baths, and prescribing diet and exercise for the treatment, relief, and cure of bodily infirmity or disease, without the use of medicine, drugs, or surgery." 21 R. C. L., Physicians and Surgeons, sec. 2. See, also, *S. v. McKnight, supra.*

In all probability, the General Assembly of 1907 enacted the statutes relating to the practice of osteopathy now embodied in article 7 of chapter 90 of the General Statutes because of the decision in *S. v. McKnight, supra,* in which this Court recognized that osteopathy is a "mode of treatment which absolutely excludes medicines and surgery from its pathology" and held that by reason thereof the statutes requiring examination and license "before beginning the practice of medicine or surgery" did not apply to osteopaths. Be this as it may, the Legislature has expressly defined osteopathy "to be the science of healing without the use of drugs, as taught by the various colleges of osteopathy recognized by the North Carolina Osteopathic Society." G. S., 90-129. Other statutes manifest the legislative recognition of osteopathy as a non-drug-giving

system of healing.   P. L. 1913, c. 92; C. S., 6701; C. S., 6704; P. L. 1937, c. 301.

But the defendant contends that G. S., 90-129, imposes upon the State the burden of showing beyond a reasonable doubt "that the action or practice with which the defendant, a duly licensed osteopathic physician, is charged was *not taught* in the recognized colleges of osteopathy." This contention is interesting, but not convincing. The statutes clearly contemplate that osteopathic physicians shall diagnose and treat diseases by employing osteopathy. The words "as taught by the various colleges of osteopathy recognized by the North Carolina Osteopathic Society" do not set at large the signification of "osteopathy," permitting the colleges to give it any meaning they choose. The thing to be taught is osteopathy— "the science of healing without the use of drugs." The Legislature merely authorizes the colleges to determine, select, and teach the most desirable methods of doing what is comprehended within the term "osteopathy." The colleges cannot change the law of North Carolina, or widen the scope of the osteopath's certificate so as to permit him to practice other systems of healing by the simple expedient of varying their curricula. See *State v. Gleason,* 148 Kan., 1, 79 P. (2d), 911; *Commonwealth v. Daily,* 75 Pa. Sup. Ct., 510.

The conclusion is inescapable that the Legislature has denied to licensed osteopaths the privilege of using drugs in their practice. It necessarily follows that a licensed osteopathic physician exceeds the limits of his certificate and is guilty of practicing medicine without being licensed and registered so to do within the purview of G. S., 90-18, and G. S., 90-19, if he administers or prescribes drugs in treating the ailments of his patients. Whether the law in this respect should be modified in any degree is a matter for the lawmakers and not for the judges.

The defendant further insists, however, that he was entitled to a judgment of nonsuit or to a directed acquittal in conformity to his prayers for instruction in the court below for the independent reason that the testimony of the prosecution did not indicate that any of the substances mentioned in the evidence constituted drugs in a legal sense. His argument here is based upon the proposition that no substance is a drug within the meaning of the laws governing the practice of osteopathy unless it is compounded pursuant to some individual formula, or unless it is poisonous, or unless it is habit forming in nature. To sustain his position in this regard, he cites the Narcotic Drug Act embodied in article 5 of chapter 90 of the General Statutes, and the provisions of the statutes regulating the practice of pharmacy which permit retailers of general commodities to sell "nonpoisonous domestic remedies . . . and patent or proprietary preparations which do not contain poisonous ingredients." G. S., 90-71.

When the Legislature undertook to regulate the calling of the pharmacist and to place safeguards around the handling of narcotics, it was not dealing with the practice of osteopathy—"the.science of healing without the use of drugs." So the cited statutes do not furnish the criterion for determining the meaning of the word "drugs" in the laws relating to osteopaths. We hold that in so far as the practice of osteopathy is concerned, a "drug" is any substance used as a medicine or in the composition of medicines for internal or external use, and a "medicine" is any substance or preparation used in treating disease. *Collins v. Insurance Co.,* 79 N. C., 279, 28 Am. R., 322; *People v. Garcia,* 1 Cal. App. (2d) Supp., 761, 32 P. (2d), 445; *Territory v. Takamine,* 21 Haw., 465; *Carroll Perfumers v. State,* 212 Ind., 455, 7 N. E. (2d), 970; *Department of State v. Kroger Grocery & Baking Co.,* Ind. App., 40 N. E. (2d), 375; *Larsen v. Paine Drug Co.,* 169 App. Div., 838, 155 N. Y. S., 759; 28 C. J., 496-497; 16 C. J., 766-767; 40 C. J., 626-627; 17 Am Jur., Drugs and Druggists, sec. 3; 41 Am. Jur., Physicians and Surgeons, sec. 2. Hence, the term "drugs" embraces patent or proprietary remedies possessing or reputed to possess curative or remedial properties sold and used for medicines. This is true irrespective of whether such remedies contain poisonous ingredients, or whether they may be purchased without any direction from a physician, or whether they can be obtained at retail stores generally. Calling drugs domestic or family remedies does not rob them of their character as medicines. *State Board of Pharmacy v. Matthews,* 197 N. Y., 353, 90 N. E., 966, 26 L. R. A. (N. S.), 1013. It has been judicially determined that a tonic is a medicinal preparation. *United States v. J. D. Iler Brewing Co.,* 121 F., 41, 57 C. C. A., 381. The lexicographers declare that a laxative is a medicine. Webster's Twentieth Century Dictionary; Funk & Wagnalls' New Standard Dictionary. Milk, however, is a food. *Merle v. Beifeld,* 194 Ill. App., 364. So the accused did not exceed the bounds of his osteopathic certificate when he advised the nursing mother with respect to her baby's diet. Whether a vitamin preparation is a drug or a food is ordinarily a question of fact. The same substance may be a drug under one set of circumstances, and not a drug under another. The test is whether it is administered or employed as a medicine. *Stewart v. Robertson,* 45 Ariz., 143, 40 P. (2d), 979; 40 C. J., 625. For the purpose of this particular case, however, it is assumed that the vitamin preparations at issue were used solely for nourishment, and that the defendant did not transgress the scope of his osteopathic certificate in urging their use by his patients.

When the testimony is viewed in the light of the authorities and reasons set out above, it is plain that the State has presented evidence tending to show that many of the substances in controversy were drugs within the meaning of the law.

The defendant further insists, however, that, in any event, he was entitled to a judgment of nonsuit or to a directed acquittal in conformity to his requests for instruction in the court below upon the ground that the testimony of the prosecution did not indicate that he had administered or prescribed any of the substances in question in treating the ailments of his patients. It is undoubtedly true that he did not exceed the limits of his osteopathic certificate in his treatment of patients suffering with skin diseases for the statute specifically confers upon a licensed osteopath the privilege of practicing radiology. G. S., 90-18, subsection 13. But the testimony tending to show that he had given hypodermic injections of various substances to his patients in treating their ailments was sufficient to overcome any claim to a nonsuit or a directed acquittal in so far as the charge set forth in the indictment is based upon the administering of drugs. A person administers drugs when he gives or applies drugs to a patient. *Barfield v. State,* 71 Okl. Cr., 195, 110 P. (2d), 316; *Chandler v. State,* 3 Okl. Cr., 254, 105 P., 375.

The accused asserts that it must be ruled as a matter of law that he did not prescribe drugs because he did not issue any written prescriptions. We are unwilling to hold that the law permits an osteopath to do by word of mouth what it forbids him to do with pen or pencil. The giving of any direction to a patient for the use or application by him of any drugs for the cure of any bodily disease is prescribing drugs. *State v. Lawson,* 22 Del., 395, 65 A., 593, 69 A., 1066; *People v. Kabana,* 321 Ill. App., 158, 52 N. E. (2d), 320; *State v. Hueser,* 205 Iowa, 132, 215 N. W., 643. And this is so even though the direction may be given orally. *State v. Lawson, supra; People v. Mash,* 235 Ill. App., 314. It is undoubtedly true, as the accused contends, that "the defendant cannot be convicted in this case for doing as an osteopathic physician what he would have a perfect legal right to do as a private citizen," and that a private citizen can suggest to friends the advisability of taking some medicine without running afoul of the law. But the evidence in this case does not intimate that the accused confined himself to recommending the use of some remedy by some acquaintances. It tends to show that he held himself out as an expert in medical affairs, and in determining the proper remedies for ailments diagnosed by himself on the examination of his patients, and that he gave oral directions through the medium of druggists to his patients with respect to the mode of administering medicines which he told them to take for their ailments, and that he charged his patients fees for so doing. Manifestly, this testimony was sufficient to overcome any claim to a nonsuit or a directed acquittal upon the charge embraced in the indictment in so far as such charge is founded upon the prescribing of drugs in the treatment of the ailments of others. *S. v. Van Doran,* 109 N. C., 864, 14 S. E., 32.

---

---

After instructing the jurors that they were the sole judges of the credibility of the witnesses and of the weight to be given to the testimony, the trial judge charged the jury, in substance, that if the jury found beyond a reasonable doubt that all of the evidence in the case was true, it would be the jury's duty to convict the defendant; but that otherwise it would be the jury's duty to return a verdict of not guilty. The defendant excepted to the instructions upon the ground that they constituted an improper direction of the verdict.

It is to be remembered that this is not a case where it was incumbent on the State to establish a particular intent on the part of the accused as a necessary element of the crime. The only testimony presented to the jury was that of the State. It tended to show that the defendant had exceeded the scope of his osteopathic certificate and had administered and prescribed drugs for fees in treating the ailments of his patients. This evidence was unambiguous in nature, and susceptible of only one construction. If it was true, the defendant was clearly guilty of practicing medicine without being licensed and registered so to do as charged in the indictment. It was not contradicted or weakened in any degree by any fact or circumstance—not even by the testimony indicating that the defendant usually confined his ministrations to his patients to osteopathic procedures. Hence, we conclude that on the record here it was permissible for the trial judge to instruct the jury to return a verdict of guilty if they found all of the evidence in the case to be true beyond a reasonable doubt. *S. v. Dickens,* 215 N. C., 303, 1 S. E. (2d), 837; *S. v. Langley,* 209 N. C., 178, 183 S. E., 526; *S. v. Norris,* 206 N. C., 191, 173 S. E., 14; *S. v. Strickland,* 192 N. C., 253, 134 S. E., 850; *S. v. Plummer,* 186 N. C., 261, 119 S. E., 488; *S. v. Estes,* 185 N. C., 752, 117 S. E., 581; *S. v. Murphrey,* 186 N. C., 113, 118 S. E., 894.

A careful examination of the other assignments of error relied on by the accused reveals nothing of which he can justly complain.

Our conclusion is that no reversible error has been made to appear, and that the judgment entered below should be upheld.

No error.